SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
CHARLES S. DONOVAN, Cal. Bar No. 103667
GUYLYN R. CUMMINS, Cal Bar No. 122445
ERIC J. DiIULIO, Cal. Bar No. 301439
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:  415.434.9100
Facsimile:  415.434.3947
Email:       cdonovan@sheppardmullin.com
             gcummins@sheppardmullin.com
             ediiulio@sheppardmullin.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kevin Gallagher, on behalf of himself; and Donor No. 1, individually and on behalf of all anonymous donors to Free Barrett Brown,<br><br>        Plaintiffs,<br><br>    v.<br><br>United States; Candina Heath; Robert Smith; Does 1-10,<br><br>        Defendants. | Case No.<br><br>**CLASS-ACTION COMPLAINT FOR VIOLATION OF RIGHT TO SPEAK AND ASSOCIATE ANONYMOUSLY UNDER THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION; THE STORED COMMUNICATIONS ACT; AND THE CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY**<br><br>**DEMAND FOR JURY TRIAL** |

Kevin Gallagher, on behalf of himself, and Donor No. 1, on behalf of himself and on behalf of all others who are similarly situated, allege:

**INTRODUCTION**

1. This is a case about government agents abusing the trust vested in them by wielding their authority to settle personal scores. Defendants' conduct violated the First Amendment of the United States Constitution, the Stored Communications Act (18 U.S.C. § 2701 *et seq.*), and the privacy rights enumerated in the California Constitution (Art. I, § 1).

2. The First Amendment protects anonymity where, as here, identification and fear of reprisal would deter Constitutionally-protected conduct. In short, Mr. Gallagher established a crowd-funding campaign to support the defense of a jailed journalist because he believed that criminal charges were levied because of the anti-government views the journalist espoused, rather than the conduct he engaged in. Donor No. 1 agreed and wished to help provide the journalist with private defense counsel. To that end, Donor No. 1 made a donation to the crowd-funding campaign under the assumption that his donation would remain anonymous. Hundreds of like-minded individuals from all over in the country did the same. These anonymous donations were protected by the First Amendment.

3. The government agents responsible for the arrest and prosecution of the journalist violated the First Amendment by seeking the identities of the donors to the crowd-funding campaign, as well as the amounts of each donation. This violation began when Assistant United States Attorney Candina Heath sent a subpoena (the "WePay Subpoena") to WePay, Inc. ("WePay"), the host of the crowd-funded legal defense fund, directing WePay to send "any and all information" pertaining to the legal defense fund to Special Agent Robert Smith of the Federal Bureau of Investigation ("FBI"). The subpoena claimed that the information it requested would be used at the trial of the jailed journalist. However, the identities of, and the amounts donated by, the journalist's supporters are completely irrelevant to the charges levied against the journalist. On information and

1  belief, the WePay Subpoena was part of a larger scheme by Ms. Heath and Mr. Smith to
2  unlawfully surveil the donors in violation of the First Amendment.  As the Ninth Circuit
3  has recognized, "[t]he right of those expressing political, religious, social, or economic
4  views to maintain their anonymity is historic, fundamental, and all too often necessary.
5  The advocacy of unpopular causes may lead to reprisals – not only by government but by
6  society in general.  While many who express their views may be willing to accept these
7  consequences, others not so brave or so free to do so will be discouraged from engaging in
8  public advocacy."  *Rosen v. Port of Portland*, 641 F.2d 1243, 1251 (9th Cir. 1981).
9  Defendants' surveillance scheme violated this right.

10         4.      The WePay Subpoena also violated the Stored Communications Act
11  because it sought the "contents" of "electronic communications" without a search warrant
12  or prior notice to Mr. Gallagher, Donor No. 1, or any other affected donor.

13         5.      Finally, the WePay Subpoena violated the California constitutional
14  right to privacy of Donor No. 1 and other anonymous California donors because Donor
15  No. 1 and the other donors reasonably expected their donations would remain private, and
16  the WePay subpoena seriously intruded upon that expectation.

17                          **JURISDICTION & VENUE**

18         6.      This Court has original subject matter jurisdiction over the claims for
19  relief for violation of the First Amendment and Stored Communications Act under 28
20  U.S.C. § 1331.  The Court has supplemental jurisdiction over the California constitutional
21  privacy claim for relief under 28 U.S.C. § 1367.  Donor No. 1 made a donation in this
22  judicial district, and Donor No. 1 also lives in this judicial district.  On information and
23  belief, many other donors live in, and made donations from, California as well.  By
24  sending the subpoena to WePay's headquarters in Palo Alto, California, Defendants
25  engaged in intentional action that was expressly aimed at, and caused harm in, California.
26  The Court has personal jurisdiction over Ms. Heath and Mr. Smith.

27         7.      Donor No. 1 sues Ms. Heath and Mr. Smith under *Bivens v. Six*
28  *Unknown Named Agents Of Federal Bureau Of Narcotics*, 403 U.S. 388 (1971).  *Bivens*

actions are identical to actions brought under 42 U.S.C. § 1983 but for the replacement of a state actor with a federal actor. *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011). *Bivens* applies to claims brought under the First Amendment. *Gibson v. United States*, 781 F.2d 1344, 1342 (9th Cir. 1986). The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States who acted under color of law while taking the actions subject to complaint, Donor No. 1 resides in this district, and no real property is involved in this action. Venue is also appropriate under 28 U.S.C. § 1391(b)(2) because the WePay Subpoena was sent to Palo Alto, California and Donor No. 1 made at least one donation within this district.

9. **Intradistrict Assignment**: Donor No. 1's donation was made in Alameda County. Accordingly, assignment to the San Francisco or Oakland Division would be appropriate.

### PARTIES

10. Kevin Gallagher is a resident of San Francisco, California.

11. Donor No. 1 is a resident of this judicial district who made an anonymous donation from within this judicial district to support the legal defense of a jailed journalist.

12. Pursuant to 18 U.S.C. § 2712 and 28 U.S.C. § 2675, Mr. Gallagher and Donor No. 1 filed administrative claims with the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") on or about March 30, 2016. To date, their claims are unanswered.

13. Donor No. 1 satisfies the requirements to sue anonymously. In the Ninth Circuit, plaintiffs may proceed anonymously where the "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Does I – XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). This test is satisfied where, as here, "the injury litigated against would be incurred as a

1 result of the disclosure of the plaintiff's identity." *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). Donor No. 1 made an anonymous donation to the Free Barrett Brown legal defense fund. This suit seeks to protect Donor No. 1's right to remain anonymous while doing so, a right long recognized as a necessary corollary of the First Amendment. *See NAACP v. Alabama*, 357 U.S. 449 (1958). Revealing the name of Donor No. 1 would cause the very injury this suit seeks to redress.

14. At all times relevant to this action, defendant Candina Heath was a citizen of Texas who worked for the Department of Justice ("DOJ") where she was an Assistant United States Attorney in the Northern District of Texas. Donor No. 1 sues Ms. Heath in her individual capacity.

15. At all times relevant to this action, defendant Robert Smith was a citizen of Texas, where he was a Special Agent in the Dallas office of the FBI. Donor No. 1 sues Agent Smith in his individual capacity.

16. Plaintiffs sue the United States pursuant to 18 U.S.C. § 2712.

17. Plaintiffs are ignorant of the true names and capacities of the Defendants sued as Does 1-10 and therefore sue such Defendants under fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of Does 1-10 when their true names and capacities have been ascertained. On information and belief, Does 1-10 are legally responsible in some manner for the events described in this Complaint, and for the damages suffered by Plaintiffs and the donors to Free Barrett Brown. At all relevant times, Does 1-10 acted as agents, servants, and/or employees of the named defendants.

**FACTUAL BACKGROUND**

18. Since Edward Snowden revealed the National Security Agency's secret surveillance program, Americans have become more aware of the United States government's indiscriminate monitoring of American citizens. This newfound knowledge has been made possible by journalists and activists seeking to hold the government accountable for its surveillance activities. One of these individuals is Barrett Brown, a

-4-

journalist who has reported extensively on the links between the United States government and private intelligence contractors.

19. Various groups of computer hackers have also attacked these private intelligence firms and exposed their data and internal communications. The hack of one such firm, Strategic Forecasting, Inc. ("Stratfor"), was coordinated by an FBI informant and carried out by Jeremy Hammond.[1] The informant, Hector Xavier Monsegur, provided Mr. Hammond with information about the vulnerability of Stratfor's systems. At that time, the FBI had Mr. Monsegur under comprehensive surveillance. On information and belief, the FBI was aware that Mr. Monsegur was coordinating the Stratfor hack before it occurred, and could have prevented it. The FBI elected not to prevent the hack because it wanted to use Stratfor as bait to go after Mr. Hammond, one of the most prominent members of Anonymous, a loose affiliation of computer hackers and activists. The Stratfor hack produced millions of emails which contained, among other things, thousands of credit card numbers and authentication features. One former FBI agent characterized the government's conduct as follows: "I am concerned in this case that the FBI seemed more interested in inflating the potential charges rather than mitigating the potential harm to innocents."[2]

20. In December of 2011, Mr. Brown transferred a link to a file containing credit card information from one public chatroom to another. The FBI, anxious to conceal its involvement in the hack, cracked down hard.

21. In early 2012, agents of the FBI, led by Agent Smith, executed a search warrant at the home of Mr. Brown's mother.

22. This greatly upset Mr. Brown, who posted three videos on www.youtube.com and several statements on www.twitter.com that threatened Agent

---

[1] http://www.dailydot.com/politics/hammond-sabu-fbi-stratfor-hack/

[2] *Id*.

1  Smith.  Shortly thereafter, Mr. Brown was indicted for those statements and for copying
2  and pasting the link to the hacked documents between chat rooms.  Among other things,
3  Mr. Brown was charged with internet threats, retaliation against a federal law enforcement
4  officer, and aggravated identity theft.  At one point, he faced over 100 years in prison.  For
5  purposes of comparison, Jeremy Hammond, the hacker who unlawfully accessed and
6  initially posted the documents, faced a maximum penalty of ten years in prison for his
7  crimes.

8          23.     News of Mr. Brown's arrest spread amongst free speech and free
9  press advocates.  As the charges piled up, mainstream media picked up on the story.  The
10 details of Mr. Brown's arrest, and the charges he faced, eventually reached Kevin
11 Gallagher, a computer systems administrator.

12         24.     After learning of the severity of the sentence Mr. Brown faced, Mr.
13 Gallagher started a crowd-funding campaign called Free Barrett Brown to raise funds to
14 provide a private defense for Mr. Brown.  Mr. Gallagher used WePay to set up the
15 campaign.  At that time, WePay's website advertised that it provided "everything you need
16 to engage donors and accept donations."[3]  Once a webpage was created, WePay helped
17 users like Mr. Gallagher accept donations and publicize their causes through social media
18 and Google searches.  It also provided a record keeping service that helped users thank
19 donors.  In exchange for these services, WePay took a percentage of each donation
20 received.

21         25.     Individuals, including Donor No. 1, donated over $40,000.00 to Free
22 Barrett Brown through the page Mr. Gallagher created, www.wepay.com/donations/free-
23 barrett-brown.  The donors provided WePay with their bank account or credit card
24 information to complete these transactions.  In the course of making their donations,
25 WePay also offered donors the option to include a message.  Many donors took advantage
26 of this to send Mr. Brown messages of support such as:

---

[3] WePay has since discontinued this aspect of its service.

        - "the American people vitally need to know what their employees are doing, not the other way around!"

        - "prosecutorial bludgeoning must end";

        - "I stand with Barrett Brown and against oppressive U.S. government prosecution of journalists"; and

        - "I think it is imperative that everyone who cares about free speech, a free internet, or is horrified by prosecutorial overreach, donate to Barrett Brown's legal defense."

26. The First Amendment protects the donors' right to send these donations and messages, and it protects their right to remain anonymous while doing so. Cognizant of the particularly sensitive nature of the cause for which he was soliciting donations, Mr. Gallagher took every effort to maintain the anonymity of the donors to Free Barrett Brown. He informed the donors via the donation page that "[w]hat information you choose to provide will be kept strictly confidential."

27. Shortly after it began, the Free Barrett Brown campaign attracted the attention of the DOJ and the FBI, and Defendants began their illegal monitoring program. Once Agent Smith learned that Mr. Brown was receiving support via the Free Barrett Brown crowd-funding campaign, he enlisted the help of Ms. Heath and the two of them began efforts to identify and surveil Mr. Brown's financial supporters.

28. On information and belief, Defendants conspired to draft and serve the WePay Subpoena, which was part of a larger scheme to unlawfully identify, target, and surveil supporters of Mr. Brown. As part of the illegal surveillance scheme, Defendants also sent a subpoena to the web-hosting company CloudFlare, Inc. One media outlet characterized the use of Mr. Brown's trial to seek information from such sources as "a remarkable fishing expedition."[4] On information and belief, the unlawful surveillance

---

[4] http://www.crikey.com.au/2013/04/05/reveal-the-truth-about-cybersecurity-face-the-wrath-of-the-us/

scheme also sought information from, among other sources, social media websites, payment processing companies, financial institutions, and other crowd-funding websites in order to identify and obtain as much information as possible about Mr. Brown's supporters. Donor No. 1 believes this scheme was initiated to harass the donors and retaliate against them for the donors' exercise of protected conduct – making anonymous donations in support of Mr. Brown's legal defense. Donor No. 1 also believes this scheme continues today and that the information gained from the WePay Subpoena, and others like it, is currently being used to monitor Mr. Brown's supporters. Defendants' conduct has a chilling effect on protected First Amendment activity.

29. Mr. Gallagher first suspected that Defendants might have been illegally monitoring protected communications between himself and the donors when he obtained email correspondence that suggested that Ms. Heath had obtained sensitive, non-public information regarding the creation of, and donations made to, the Free Barrett Brown crowd-funding campaign.

30. Mr. Gallagher investigated whether any sensitive, non-public information was improperly disclosed. During the investigation, counsel for Mr. Gallagher received a letter from counsel for WePay confirming that WePay received the WePay Subpoena and produced documents in response. Then, counsel for WePay produced the WePay Subpoena, which sought "any and all information" regarding the campaign, including sensitive personal and financial information of the donors and the complete transaction history. In other words, the WePay Subpoena requested the identities of, and the amounts of donations made by, the donors to Free Barrett Brown in direct violation of the donors' First Amendment right to make these donations anonymously. The WePay Subpoena's broad scope also encompassed the messages the donors sent to Mr. Brown.

31. The WePay Subpoena indicated that the information it requested would be used in the trial of Barrett Brown. Oddly enough, however, instead of asking WePay to send its response directly to Ms. Heath, the prosecutor, or to lodge its response with the court, the WePay Subpoena compelled WePay to produce information directly to

1  Agent Smith of the FBI.  This renders the WePay Subpoena improper under Federal Rule
2  of Criminal Procedure 17(c).  It also demonstrates that Defendants' claimed purpose of
3  using the information produced in response to the WePay Subpoena at Barrett Brown's
4  trial was purely pretextual.  The true goal of the WePay Subpoena, rather, was to facilitate
5  the unlawful surveillance of the anonymous donors to the crowd-funding campaign.

6        32.    Upon discovering that the WePay Subpoena was unlawful, Mr.
7  Gallagher informed the donors.  Donor No. 1 was alarmed to learn that his government
8  illegally surveilled his donation.  Donor No. 1 does not publicize his financial activities
9  and always ensures that any donations he makes are kept private.

## CLASS ACTION ALLEGATIONS

### (as to Donor No. 1's claims)

12        33.    For the First Amendment claim, Donor No. 1 proposes to certify a
13  class of all United States citizens who made anonymous donations to the Free Barrett
14  Brown campaign.

15        34.    For the Stored Communications Act claim, Donor No. 1 proposes to
16  certify a class of all United States citizens who made donations to the Free Barrett Brown
17  campaign.

18        35.    For the California constitutional right to privacy claim, Donor No. 1
19  proposes to certify a class of all California citizens who made anonymous donations to the
20  Free Barret Brown campaign.

21        36.    Excluded from the classes are: Ms. Heath and Agent Smith, and each
22  of their agents and legal representatives.  Also excluded are the judge and staff to whom
23  this case is assigned, and the judge's immediate family.

24        37.    These classes satisfy the requirements of Fed. R. Civ. Proc. 23(a):
25      a.    **Numerosity**: hundreds of individuals from around the United
26      States donated over $40,000.00 to Free Barrett Brown, mostly in small amounts.
27      On information and belief, all of these individuals are affected by the improper
28      surveillance activities alleged.  The number of donors alone would make joinder

impractical, but a class action is a particularly appropriate vehicle given that the donations were anonymous. It would make little sense to require donors to come forward individually, and publicly, to assert their right to remain anonymous.

      b.    **Commonality**: virtually all questions of law and fact are common to the class. The most important are whether the WePay Subpoena, and any other improper requests for information, violate the donors' constitutional and statutory rights. Other common questions include:

      (1)    whether the WePay Subpoena sought information irrelevant to the prosecution of Mr. Brown;

      (2)    whether the WePay Subpoena was procedurally defective under Fed. R. Crim. Proc. 17(c);

      (3)    whether Ms. Heath and Mr. Smith needed a search warrant to obtain the information requested by the WePay Subpoena;

      (4)    whether Ms. Heath and Mr. Smith were required to notify the donors prior to sending the WePay Subpoena and whether they did so; and

      (5)    whether Ms. Heath and Agent Smith conspired to unlawfully surveil Mr. Brown's supporters for improper reasons.

      c.    **Typicality**: Donor No. 1 suffered invasions of his First Amendment right to speak and associate anonymously, his California constitutional right to privacy, and his rights under the Stored Communications Act. These are the same injuries suffered by the rest of the classes. He seeks redress of the same conduct under the same legal theories.

      d.    **Adequacy**: Donor No. 1 is an adequate class representative because he has the same interests as the rest of the donors and is prepared to serve as their fiduciary. Donor No. 1's counsel have ample First Amendment and class action litigation experience.

38. This action may be certified as a class action under both Fed. R. Civ. Proc. 23(b)(2) & (3).

39. **Fed. R. Civ. Proc. 23(b)(2):** Defendants' conduct applies to all donors in the class. Further, Donor No. 1 seeks declaratory and injunctive relief that would apply with equal force class-wide.

40. **Fed. R. Civ. Proc. 23(b)(3):** Common questions predominate and a class action is a superior method of resolution.

    a. **Predominance of Common Questions**: nearly all questions are common, including:

        (1) whether Ms. Heath and Agent Smith engaged in a conspiracy to unlawfully surveil the donors who contributed to Free Barret Brown;

        (2) whether such conspiracy violated the donors' constitutional and statutory rights;

        (3) whether Ms. Heath and Mr. Smith needed a search warrant to obtain the information requested by the WePay Subpoena;

        (4) whether Ms. Heath and Mr. Smith were required to notify the donors prior to sending the WePay Subpoena and whether they did so;

        (5) whether the WePay Subpoena requested information that was relevant to the crimes Mr. Brown was accused of; and

        (6) whether there is a valid justification for the WePay Subpoena beyond a desire to unlawfully surveil Mr. Brown's supporters.

    b. **Superiority of Class Action**: a class action is particularly appropriate in this circumstance because aggrieved donors may be hesitant to vindicate their rights on an individual basis for fear of government retaliation. The class action vehicle allows individual rights to be vindicated while the individuals remain anonymous, as they were when they made their donations, and as they

should have remained.  Further, proceeding as a class action will save time and judicial resources.

### FIRST CLAIM FOR RELIEF – VIOLATION OF THE FIRST AMENDMENT RIGHT TO SPEAK AND ASSOCIATE ANONYMOUSLY

### (Donor No. 1 and the Class Against Defendants Heath and Smith)

41. Donor No. 1 incorporates each of the allegations set forth above into this claim for relief.

42. Defendants acted under color of law by serving the WePay Subpoena. The WePay Subpoena's bald assertion that the information it requested would be used at Mr. Brown's trial, without any indication or evidence of a connection to the crimes Mr. Brown was charged with, demonstrates the complete lack of relevance of the information requested.  The WePay Subpoena's true purpose was to gather information regarding the donors.  When WePay produced documents in response, the violation was complete. Because Defendants had no cause to suspect wrongdoing by the donors, and thus could not otherwise obtain information about the donors legally, they used the trial of Mr. Brown, and the WePay Subpoena, as an illegal work-around.

43. The donations were acts of political expression, showing the donors' frustrations with what they perceived to be government bullying and prosecutorial overreach.  Donations made in support of litigation are protected by the First Amendment. The donors violated no law by sending money to support Mr. Brown's legal defense, and instead were exercising their constitutionally protected rights.  Thus, Defendants' surveillance of the donors was unlawful.

44. Since the WePay Subpoena sought information that was irrelevant to the charges brought against Mr. Brown, Donor No. 1 believes the WePay Subpoena was sent to retaliate against the donors' exercise of protected conduct in violation of their First Amendment right to anonymous speech and association, and to deter further protected expression.  Defendants never intended to allow the information subpoenaed from WePay to see the inside of Mr. Brown's courtroom.  Donor No. 1 believes Defendants maintain

and continue to use the information produced in response to the WePay Subpoena, as well as other information gathered from the illegal monitoring program, to continually and unjustifiably surveil the donors to Free Barrett Brown.

**SECOND CLAIM FOR RELIEF – VIOLATION OF**

**THE STORED COMMUNICATIONS ACT**

**(Kevin Gallagher, Donor No. 1, and the Class Against the United States)**

45.     Plaintiffs incorporate each of the allegations set forth above into this claim for relief.

46.     The Stored Communications Act ("SCA") provides that government entities must obtain a warrant to compel the disclosure of the contents of electronic communications that are less than 180 days old from electronic communication service providers.  18 U.S.C. § 2703(a).

47.     Government entities may require the disclosure of contents of electronic communications that are more than 180 days old with a subpoena only if prior notice is given to the customer or subscriber.  18 U.S.C. § 2703(b).

48.     An "electronic communication" is "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce[.]"  18 U.S.C. § 2510(12).

49.     The "contents" of "electronic communications" include "any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

50.     During the relevant time period, WePay ran a crowd-funding service that allowed users to create webpages geared towards soliciting donations in support of certain causes.  Users could publicize the webpage they created, donors could make contributions, and WePay would take a commission for processing each transaction.

51.     The webpage Mr. Gallagher created using WePay's service allowed him to reach out to potential donors to Mr. Brown's legal defense fund and process their

1  donations by electronic means.  The anonymous donors used WePay's service to donate
2  money and send messages of support to Mr. Brown, such as "Hang in there Mr. Brown,
3  there are people rooting for you" and "Thank you for your integrity and fight for freedom."
4      52.   The donations, and the messages of support, encompass the contents
5  of electronic communications as defined by the SCA.
6      53.   On information and belief, neither the FBI nor the DOJ used a search
7  warrant to compel WePay to disclose its records relating to the crowd-funding campaign.
8      54.   Neither Mr. Gallagher nor Donor No. 1 received prior notice of the
9  WePay Subpoena.  On information and belief, neither did any of the anonymous donors.
10     55.   Finally, the WePay Subpoena seeks information beyond the SCA's
11 narrow and carefully circumscribed exception for requesting records without a search
12 warrant or notice to the affected users.

### THIRD CLAIM FOR RELIEF – VIOLATION OF THE RIGHT TO PRIVACY UNDER THE CALIFORNIA CONSTITUTION
### (Donor No. 1 And Subclass Against All Defendants)

16     56.   The surveillance program also violated Donor No. 1's right of privacy
17 set out in Article 1, Section 1 of the California Constitution.  Donor No. 1 brings this claim
18 on behalf of a subclass of donors who are California citizens.  If discovery demonstrates
19 that donors from other states with constitutional privacy protections were ensnared in
20 Defendants' surveillance program, Donor No. 1 will seek leave to amend his complaint to
21 bring claims on their behalf as well.  States with applicable constitutional privacy
22 protections include, without limitation, Alaska (Art. I, § 22), Arizona (Art. II, § 8), Florida
23 (Art. I, § 23), Hawaii (Art. I, § 6), Illinois (Art. I, §6), Louisiana (Art. I, § 5), Montana
24 (Art. II, § 10), South Carolina (Art. I, § 10), and Washington (Art. I, § 7).
25     57.   California's constitutional right to privacy protects against serious
26 invasions of legally protected privacy interests provided there is a reasonable expectation
27 of privacy.
28

58. The surveillance program violated Donor No. 1's legally protected right to speak and associate anonymously. As the Ninth Circuit has recognized, this right is a vital component of First Amendment protection.

59. Donor No. 1 had a reasonable expectation of privacy. The donation page suggested that all donations would be kept "strictly confidential."

60. The surveillance program seriously invaded – and, indeed, violated – Donor No. 1's right to remain anonymous because his identity was disclosed to the government.

## PRAYER FOR RELIEF

Donor No. 1 prays for judgment against Defendants:

**FIRST CAUSE OF ACTION:**

A. Declaring that the conduct alleged above violated the First Amendment rights of Donor No. 1 and the class;

B. Directing the FBI, DOJ, and other agencies or entities that received donors' private, sensitive information to destroy such information;

C. Enjoining Defendants from engaging in similar unlawful surveillance in the future;

D. Awarding Donor No. 1 the costs, including reasonable attorney's fees, associated with bringing this action; and

E. Any other relief the Court deems proper.

**SECOND CAUSE OF ACTION:**

A. Declaring that the conduct alleged above violates the Stored Communications Act;

B. Awarding Kevin Gallagher, Donor No. 1, and the class money damages, including statutory damages, and reasonable litigation costs under 18 U.S.C. § 2712(a);

C. Directing the FBI and the DOJ to initiate a proceeding to determine whether discipline is warranted against Mr. Smith and Ms. Heath; and

D. Any other relief the Court deems proper.

**THIRD CAUSE OF ACTION:**

    A.    Declaring that the conduct alleged above violated the California constitutional right to privacy;

    B.    Awarding Donor No. 1 and the subclass damages according to proof at trial;

    C.    Awarding Donor No. 1 the costs, including reasonable attorney's fees, associated with bringing this action; and

    D.    Any other relief the Court deems proper.

**DEMAND FOR JURY TRIAL**

Donor No. 1 demands a jury trial on the first and third causes of action.

Dated: February 6, 2017    Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _/s/ Eric J. DiIulio_

CHARLES S. DONOVAN
GUYLYN CUMMINS
ERIC J. DiIULIO
Attorneys for Plaintiffs