1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    CHARLES S. DONOVAN, Cal. Bar No. 103667
3   GUYLYN R. CUMMINS, Cal Bar No. 122445
    ERIC J. DiIULIO, Cal. Bar No. 301439
4   Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4109
5   Telephone:   415.434.9100
    Facsimile:   415.434.3947
6   Email:       cdonovan@sheppardmullin.com
                 gcummins@sheppardmullin.com
7                ediiulio@sheppardmullin.com

8   Attorneys for Plaintiffs

9                  UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  Kevin Gallagher, on behalf of himself; and    Case No. 3:17-cv-00586-MEJ
    Donor No. 1, individually and on behalf of
13  all anonymous donors to Free Barrett          **OPPOSITION TO UNITED STATES'**
    Brown,                                        **MOTION TO DISMISS [DKT. 34]**
14
                     Plaintiffs,
15
             v.
16
    United States; Candina Heath, in her
17  individual and official capacity; Robert
    Smith, in his individual and official
18  capacity; Does 1-10,

19                   Defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................. 2

III.   OBJECTION TO REQUEST FOR JUDICIAL NOTICE (Dkt. 33) ......................... 3

IV.    THE COURT SHOULD DENY THE MOTION ...................................................... 4

       A.    Standards Applicable To Motion To Dismiss ................................... 4

       B.    The FAC States A Claim For Violation Of The SCA ...................................... 4

             1.    Plaintiffs Allege WePay is a Service Provider Under the SCA ........... 4

                   a.    WePay was an "Electronic Communications Service" ............. 5

                   b.    WePay was a "Remote Computing Service ............................ 6

             2.    To the Extent WePay was Required to do so, It Held the
                   Donations and Messages in "Electronic Storage" ................................ 7

             3.    Defendants Gained Access to the "Contents" of Electronic
                   Communications via the WePay Subpoena ........................................ 8

             4.    The FAC Alleges that Defendants Willfully Violated the SCA .......... 9

             5.    Plaintiffs are not Required to Allege Actual Damages, But
                   Even if They are They have Done so ................................................... 9

       C.    Plaintiffs Have Standing Under The Stored Communications Act .............. 10

       D.    The FAC States A Claim For Violation Of The California
             Constitutional Right To Privacy ...................................................... 11

             1.    The Right to Remain Anonymous Is a Legally Protected
                   Privacy Interest ................................................................................. 12

             2.    Donor No. 1 Had a Reasonable Expectation of Privacy ................... 14

             3.    Defendants Seriously Invaded Donor No. 1's Privacy ..................... 15

             4.    The United States Cannot Assert an Affirmative Defense in a
                   Motion to Dismiss ............................................................................. 16

             5.    The United States is Subject to Suit for Violation of Donor No.
                   1's California Constitutional Right to Privacy .................................. 18

V.     CONCLUSION .................................................................................................. 19

1

## TABLE OF AUTHORITIES

2

Page(s)

3

Cases

4

*Benin v. Center for Study of Popular Culture*
2007 WL 1795693 (N.D. Cal. Jun. 20, 2007) ....................................................... 6, 8, 12

5

6

*Citizens Legal Enforcement and Restoration v. Connor*
762 F. Supp. 2d 1214 (S.D. Cal. 2011) .......................................................... 18

7

8

*Doe v. 2theMart.com Inc.*
140 F. Supp. 2d 1088 (W.D. Wash. 2001) .................................................. 15

9

10

*Eilers v. Palmer*
575 F.Supp. 1259 (D.Minn. 1984) .......................................................... 6, 8, 12

11

*Hill v. Nat'l Collegiate Athletic Ass'n.*
7 Cal. 4th 1 (1994) .......................................................... 12, 13, 14, 15, 16, 17

12

13

*McIntryre v. Ohio Elections Comm'n*
514 U.S. 334 (1995) .......................................................... 14

14

15

*Ministerio Roca Solida v. McKelvey*
820 F.3d 1090 (9th Cir. 2016) .......................................................... 18

16

17

*Nguyen v. Barnes & Noble Inc.*
763 F.3d 1171 (9th Cir. 2014) .......................................................... 13

18

*Pioneer Electronics (USA), Inc. v. Superior Court*
40 Cal. 4th 360 (2007) .......................................................... 14

19

20

*Quon v. Arch Wireless Operating Co., Inc.*
529 F.3d 829 (9th Cir. 2008) .......................................................... 7

21

22

*Rancho Publications v. Superior Court*
68 Cal. App. 4th 1538 (1999) .......................................................... 12, 15, 16

23

24

*Rosen v. Port of Portland*
641 F.2d 1243 (9th Cir. 1981) .......................................................... 11, 14

25

*Shapiro v. Lundahl*
2017 WL 2902799 (N.D. Cal. July 7, 2017) .......................................................... 4, 10

26

27

*Six Star Holdings, LLC v. City of Milwaukee*
821 F.3d 795 (7th Cir. 2016) .......................................................... 10

28

*Steve Jackson Games, Inc. v. U.S. Secret Service*
  816 F. Supp. 432 (W.D. Tex. Mar. 12, 1993) ................................................................. 6

*Talley v. State of California*
  362 U.S. 60 (1960) ........................................................................................................ 14

*Theofel v. Farey-Jones*
  359 F.3d 1066 (9th Cir. 2004) ........................................................................................ 7

*United States v. Nixon*
  418 U.S. 683 (1974) ...................................................................................................... 13

*United States v. Reed*
  726 F.2d 570 (9th Cir.1984) .......................................................................................... 13

*In re Zynga Privacy Litig.*
  750 F.3d 1098 (9th Cir. 2014) ........................................................................................ 9

<u>Statutes</u>

5 U.S.C. § 702 ................................................................................................................... 18

18 U.S.C. 2510(15) ............................................................................................................. 5

18 U.S.C. 2703(b)(2) ........................................................................................................... 7

18 U.S.C. 2711(2) ............................................................................................................... 6

18 U.S.C. 2712(a) ............................................................................................................... 9

18 U.S.C. § 2510(8) ........................................................................................................ 8, 9

18 U.S.C. § 2510(12) ........................................................................................................... 5

18 U.S.C. § 2510(17) ........................................................................................................... 7

18 U.S.C. § 2703 ................................................................................................................. 4

18 U.S.C. § 2703(b) ............................................................................................................. 7

18 U.S.C. § 2712 ............................................................................................................... 18

28 U.S.C. § 1331 ............................................................................................................... 18

Federal Tort Claims Act ................................................................................................... 18

Stored Communications Act .................................................................. 1, 2, 4, 5, 6, 7, 9, 10

Other Authorities

First Amendment ............................................................... 6, 8, 10, 12, 14

Cal. Const. Article X, § 2 ................................................................ 18

California Constitution ........................................................... 12, 18

California Constitution Article I, § 1 ............................................ 12

Fed. R. Crim. P. 17 ........................................................................ 13

# I.    INTRODUCTION

The Court should deny the United States' Motion to Dismiss the First Amended Complaint ("Motion" or "Mot.").  The First Amended Complaint ("FAC") filed by plaintiffs Donor No. 1 and Kevin Gallagher (collectively, "Plaintiffs") adequately alleges violations of both the Stored Communications Act ("SCA") and the California constitutional right to privacy.

The FAC alleges an SCA violation because it alleges that WePay was an electronic communications provider within the meaning of the SCA because it allowed Mr. Gallagher (as the account manager) and the donors to send messages to each other and also because the donations themselves were expressive.  WePay was also a remote computing service because it allowed the donors to transmit electronic payments to the campaign (payments the donors could not have made without WePay's sophisticated services).  The messages were also stored for backup protection and therefore in "electronic storage" under the SCA.  The messages, and the donations themselves, comprised the "contents" of electronic communications.  There is no dispute that the messages were "content" communications, but the donations were too because they were intended to express displeasure with the way defendants Candina Heath and Robert Smith ("Defendants") handled the arrest and prosecution of Mr. Brown.  The violation of the SCA was willful and, because it resulted in constitutional harm, it caused compensable damages.

Donor No. 1 also states a claim for violation of the right to privacy.  First, the right to remain anonymous is a stringently protected privacy interest.  Second, Donor No. 1 reasonably expected Donor No. 1's anonymous donation to remain that way.  Third, Defendants seriously invaded Donor No. 1's privacy by unmasking Donor No. 1 to the very agents of the government Donor No. 1 criticized by donating.

The United States attempt to ignore the well-pleaded allegations in the FAC in favor of the asserted "obvious alternative explanation" reads more like a motion for summary judgment.  However, despite the United States' improper attempt to introduce

1  that is not subject to judicial notice, this case has not yet progressed to that point.  The

2  Court should deny the Motion.

3  **II.      FACTUAL BACKGROUND**

4          When Mr. Gallagher heard that a political dissident journalist had been arrested for

5  transferring a link from one publicly available chatroom to another, he felt compelled to

6  help.  FAC ¶¶ 21-24.  Mr. Gallagher started a crowd-funding campaign "to provide a

7  private defense for Mr. Brown."  FAC ¶ 25.  Donor No. 1 donated to the crowd-funding

8  campaign because he believed the journalist was imprisoned because of the views the

9  journalist espoused, rather than the conduct the journalist engaged in.  FAC ¶ 2.  Donor

10  No. 1 lives in this judicial district, which is where he made his donation.  FAC ¶ 12.  The

11  donation page for the crowd-funding campaign stated "[e]ach dollar raised is your vote in

12  this important campaign for free speech and transparency on the internet – and around the

13  world."  FAC ¶  27; Dkt. 29-3.  The donation page also informed the donors that the

14  information they provided would be "kept strictly confidential."  FAC ¶ 28.

15          Hundreds of like-minded individuals from across the country also contributed to the

16  legal defense fund.  *Id*. ¶ 2.  Many of the donors included messages to Mr. Brown, such as

17  "prosecutorial bludgeoning must end" and "I think it is imperative that everyone who cares

18  about free speech, a free internet, or is horrified by prosecutorial overreach, donate to

19  Barret Brown's legal defense."  FAC ¶ 26.

20          WePay "ran a crowd-funding service that allowed users to create webpages geared

21  towards soliciting donations in support of certain causes.  WePay helped users publicize

22  the webpages they created, donors could make contributions, and WePay would take a

23  commission for processing each transaction."  FAC ¶ 65.  WePay also allowed Mr.

24  Gallagher "to communicate with potential and actual donors to Mr. Brown's legal defense

25  fund and process their donations by electronic means.  Specifically, WePay's "[i]ntegrated

26  processing allow[ed] [Mr. Gallagher] to track and thank donors."  FAC ¶ 66.  Mr.

27  Gallagher used this service to "send thank you notes to each donor."  *Id*.

28

Shortly after the donations began pouring in, the crowd-funding campaign attracted Defendants' attention.  FAC ¶ 30.  Ms. Heath drafted the WePay Subpoena, which directed WePay to produce "any and all records and information" associated with the crowd-funding campaign, including the sources of the funds donated (i.e. "the financial institution, credit card company, account holder at financial institution or of the credit card account"), the location of the funds, a "[c]omplete transaction history, including invoices and sending account numbers and receiving account numbers," and "[a]ll records and information obtained from an verification checks on purchasers."  Dkt. 33-1 at 5.  WePay produced documents in response.  FAC ¶ 32.  At a minimum, this response included the donors' identities, sensitive financial information, and the amounts of each donation.  FAC ¶ 51; Dkt. 33-4.

Further, information available to Mr. Gallagher, the founder of the crowd-funding campaign, demonstrates that WePay maintained more information than Defendants attached to their request for judicial notice.  In addition to names, account numbers, and amounts donated, WePay also maintained "the addresses, phone numbers, email addresses, and the text of messages sent by donors."  FAC ¶ 53.

## III.    OBJECTION TO REQUEST FOR JUDICIAL NOTICE (Dkt. 33)

Although WePay's purported response to the WePay Subpoena was referenced in the FAC, it was not incorporated into the FAC.  Prior to filing this action, Plaintiffs had not seen any of the documents WePay produced in response to the WePay Subpoena.  When Defendants first sought judicial notice of the WePay Response, they failed to indicate that the document had been redacted for purposes of filing in this action.  FAC ¶ 51; Dkt. 26.  Defendants may have done this to create the impression that WePay redacted the donors sensitive and private information before complying with the WePay Subpoena.  Even though Defendants Request for Judicial notice now notes that the WePay Response was redacted to be filed in this action (meaning it was not redacted when it was received), still the Court cannot take judicial notice without affording Plaintiffs the opportunity to conduct discovery concerning the contents of WePay's response to the WePay Subpoena.

1    Plaintiffs allege that WePay maintained more information than Defendants have included

2    in the filed version of the WePay Response.  FAC ¶ 53 ("information available to Mr.

3    Gallagher as the account administrator confirms that WePay also maintained the addresses,

4    phone numbers, email addresses, and the text of messages sent by donors.")  WePay's

5    statement of compliance states that "all the documents or tangible things in the possession,

6    custody or control of WePay, Inc. which fall within the terms of the trial subpoena" and

7    that "[n]o documents or tangible things responsive to the trial subpoena have been

8    withheld by WePay, Inc." Dkt. 33-2 at 6.  The WePay Subpoena, however, sought "any

9    and all records and information" associated with the crowd-funding campaign.  Dkt. 33-1

10   at 5.  Accordingly, either Defendants produced an incomplete version of WePay's response

11   to the WePay Subpoena, or WePay withheld information from its production.  Discovery is

12   necessary to resolve this inconsistency.

13   **IV.    THE COURT SHOULD DENY THE MOTION**

14         A.    <u>Standards Applicable To Motion To Dismiss</u>

15         The Court may not dismiss the FAC unless it finds that the FAC fails to plead

16   enough facts to state a plausible claim for relief.  *Shapiro v. Lundahl*, 2017 WL 2902799,

17   at *3 (N.D. Cal. July 7, 2017) (James, M.J.) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

18   544, 570 (2007)).  Plausible claims include enough factual content to allow the court to

19   "draw a reasonable inference of liability.  *Shapiro*, 2017 WL 2902799, at *3. When

20   determining whether the FAC plausibly states a claim to relief, the Court "must accept all

21   of [the FAC's] allegations as true and construe them in the light most favorable to" Donor

22   No. 1.  *Shapiro*, 2017 WL 2902799, at *3 (citations removed).

23         B.    <u>The FAC States A Claim For Violation Of The SCA</u>

24         The SCA requires the government to obtain a warrant or provide notice to end users

25   to compel the disclosure the "contents" of "electronic communications" held by certain

26   service providers.  18 U.S.C. § 2703.  The FAC contains factual allegations sufficient to

27   support each of these elements.

28             1.    *Plaintiffs Allege WePay is a Service Provider Under the SCA*

The SCA applies to both "electronic communications services" and "remote computing services."  *Id.*  The FAC adequately alleges that WePay was acting as both.

a.      WePay was an "Electronic Communications Service"

The SCA defines electronic communication service ("ECS") is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. 2510(15).  *See also* Mot. at 9:9-20 (acknowledging that services that allow users to send electronic communications to other parties are electronic communication services).  An "electronic communication" is "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce[.]"  18 U.S.C. § 2510(12).

The United States ignores the well-pleaded allegations in the FAC that demonstrate WePay provided the users with the ability to send electronic communications.  For example, many donors sent Mr. Brown messages of support such as:

- "the American people vitally need to know what their employees are doing, not the other way around!"

- "prosecutorial bludgeoning must end";

- "I stand with Barrett Brown and against oppressive U.S. government prosecution of journalists"; and

- "I think it is imperative that everyone who cares about free speech, a free internet, or is horrified by prosecutorial overreach, donate to Barrett Brown's legal defense."

FAC ¶ 26.  The United States admits that "WePay may act as an ECS with respect to some communications (for example by providing messaging services to users through the WePay website)."  Mot. at 9:2-3.  The United States, however, faults Donor No. 1 for failing to allege whether Donor No. 1 sent such a message.  The FAC does not allege whether or not Donor No. 1 sent such a message to preserve Donor No. 1's anonymity.

However, even if Donor No. 1 did not send such a message, still Donor No. 1 could represent the anonymous donors who did through *jus tertii* standing.

Moreover, the United States completely ignores the allegation that Mr. Gallagher "used WePay's service to send thank you notes to each donor."  FAC ¶ 66.  Since the United States admits that emails and text messages fall within the purview of the SCA (Mot. at 9:9-20), it cannot seriously contend that thank you notes are not covered.

Finally, the donations themselves expressed the donors' "displeasure with the government's heavy-handed approach to the prosecution of Mr. Brown."  FAC ¶ 67.  Thus, the donations were acts of political expression and should be considered electronic communications.  *See Benin v. Center for Study of Popular Culture*, 2007 WL 1795693, at *3 (N.D. Cal. Jun. 20, 2007) ("[s]upport of litigation is a form of expression and association protected by the First Amendment."  (Citing *NAACP v. Button*, 371 U.S. 415, 428-29 (1963)); *Eilers v. Palmer*, 575 F.Supp. 1259, 1261 (D.Minn. 1984) ("compelled disclosure of the names of those individuals or groups supporting the plaintiff's lawsuit would create a genuine risk of interference with protected interests.")  WePay was an electronic communications service within the meaning of the SCA.

> b.    WePay was a "Remote Computing Service

The FAC also alleges that WePay is a remote computing system ("RCS") under the SCA.  An RCS provides the public with "computer storage or processing services by means of an electronic storage system."  *18 U.S.C. 2711(2); see also Steve Jackson Games, Inc. v. U.S. Secret Service*, 816 F. Supp. 432, 443 (W.D. Tex. Mar. 12, 1993) (an online bulletin board is a "remote computing service" under the SCA).

Here, WePay provides "processing services."  As the United States admits, "processing services" refer to "sophisticated processing" that cannot be accomplished by a user.  Mot. at 11:19-23 (citing *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 829, 902 (9th Cir. 2008)).  WePay provided "[i]ntegrated processing" that allowed Mr. Gallagher "to track and thanks donors."  FAC ¶ 66; Dkt. 29-4.  It also processed the donors' credit card payments and transmitted the donations to the account set up by Mr.

Gallagher.  The donors could not have accomplished this without WePay.  Thus, WePay provides the sort of "sophisticated processing" that is "farmed out" to cutting-edge service providers.  *Quon*, 529 F.3d at 902.  WePay is an RCS.

2. *To the Extent WePay was Required to do so, It Held the Donations and Messages in "Electronic Storage"*

At the outset, Plaintiffs note that the electronic storage requirement does not apply to remote computing services.  18 U.S.C. § 2703(b).  Rather, the prohibition on government access to electronic communications held by remote computing services that were

> received by means of electronic transmission from … a subscriber or customer of such remote computing service … solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

18 U.S.C. 2703(b)(2).  There is no dispute that the donations and messages were "received by electronic transmission."  Therefore, because WePay was authorized to access (and, indeed, accessed) the contents of the donations and messages, Defendants violated the SCA by accessing the contents of the donors' communications.

Regarding electronic communications services, the SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17).  Messages that remain on a service provider's server after delivery "fit comfortably within subsection (B)" if stored for backup protection.  *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004).  One "obvious purpose" for which messages are stored for backup protection "is to provide a second copy of the message in the event that the user needs to download it again."  *Id.*

Here, Plaintiffs allege that Mr. Gallagher had access to backup copies of the messages sent by the donors.  FAC ¶¶ 26, 53 ("information available to Mr. Gallagher as the account administrator confirms that WePay also maintained … the text of messages

sent by donors" including "I stand with Barrett Brown and against oppressive U.S. government prosecution of journalists" and "I think it is imperative that everyone who cares about free speech, a free internet, or is horrified by prosecutorial overreach, donate to Barrett Brown's legal defense.")  The messages, therefore, were in electronic storage.

### 3.   *Defendants Gained Access to the "Contents" of Electronic Communications via the WePay Subpoena*

The "content" of an "electronic communication" includes "any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).  As the United States acknowledges, "'contents' refers to the intended message conveyed by the communication."  Mot. at 12:16-18 (quoting *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014)).

Here, there is no dispute that the donors' messages regarding prosecutorial abuse fall within this definition.  Mot. at 12:20-23 (citing *Optiver Australia Pty. Ltd. & Anor. V. Tibra Trading Party, Ltd.& ORS.*, 2013 WL 256771, at *3 (N.D. Cal. Jan. 23, 2013) and acknowledging that the "body and subject line of an email" include the "content" of electronic communications).  Nor can there be legitimate dispute that the donations conveyed an intended message as well.  As alleged in the FAC, the intended message conveyed by the communication was to express criticism and displeasure of the government's handling of Mr. Brown's case.  FAC ¶ 68; Dkt. 29-3 ("[e]ach dollar raised is your vote in this important campaign for free speech and transparency on the internet – and around the world.")  Moreover, since donations in support of the legal defense of a jailed political dissident are acts of protected speech,[1] they are distinguishable from the personal

_____

[1] *Benin v. Center for Study of Popular Culture*, 2007 WL 1795693, at *3 (N.D. Cal. Jun. 20, 2007) ("[s]upport of litigation is a form of expression and association protected by the First Amendment."  (Citing *NAACP v. Button*, 371 U.S. 415, 428-29 (1963)); *Eilers v. Palmer*, 575 F.Supp. 1259, 1261 (D.Minn. 1984) ("compelled disclosure of the names of those individuals or groups supporting the plaintiff's lawsuit would create a genuine risk of interference with protected interests.")

1  identification information at issue in *Zynga*.  Surely, then, they comprise the "substance,

2  purport, or meaning of [electronic] communication[s]."  18 U.S.C. § 2510(8).

3                    4.    *The FAC Alleges that Defendants Willfully Violated the SCA*

4          The United States admits that the FAC alleges that Defendants served the WePay

5  Subpoena not to gather information relevant to the prosecution of Mr. Brown but, rather, to

6  illegally surveil and harass his financial supporters.  Mot. at 17:5-7.  The United States

7  then contends that this willful violation should be excused because of the "obvious

8  alternative explanation:  the Government subpoenaed the information to determine whether

9  Brown was financially eligible for court appointed counsel."  *Id*. at 17:8-9.

10         The problem with this reasoning, however, is that it was Mr. Brown, and not the

11  donors to the crowd-funding campaign, who was allegedly wrongly receiving court-

12  appointed counsel.  Indeed, the motion to direct funds be paid does not mention a single

13  donor, nor does it mention the amount of any single donation.  Dkt. 33-5.  Moreover, the

14  WePay Subpoena could not be used as a discovery device to uncover previously unkown

15  evidence not related to the crimes Mr. Brown was charged with.  *See* Section III.C.4 of

16  Dkt. 35 (Plaintiffs' Opposition to Individual Defendants' Motion to Dismiss).  There is

17  simply no basis to suggest that a "[c]omplete transaction history, including invoices and

18  sending account numbers and receiving account numbers; [or] [a]ll records and

19  information obtained from any verification checks on purchasers," not to mention "any and

20  all records and information" related to the crowd-funding campaign (Dkt. 33-1 at 5) were

21  in any way related to the prosecution of Mr. Brown.  Defendants' violation of the SCA was

22  willful.

23                    5.    *Plaintiffs are not Required to Allege Actual Damages, But Even if*
                           *They are They have Done so*

24

25         Plaintiffs have also alleged sufficient facts for a claim for damages.  A plain reading

26  of the SCA indicates either a showing of actual damages, or statutory damages in the

27  amount of $10,000 are available.  18 U.S.C. 2712(a) ("[T]he Court may assess as damages

28  – (1) actual damages, but not less than $10,000, whichever amount is greater").  The

1   United States presents no SCA authority supporting its contention that actual damages

2   must be plead.  Mot. at 17:16-19:9.

3       Even if a showing of actual damages is required, civil rights violations give rise to

4   actual damages.  *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir.

5   2016) ("in civil rights cases, nominal damages are appropriate when a plaintiff's rights are

6   violated but there is no monetary injury."  Citing *Carey v. Piphus*, 435 U.S. 247, 266-67

7   (1978).)  Thus, because Donor No. 1 seeks actual damages for the First Amendment

8   violation (which was effected through the violation of the SCA), this element is satisfied.

9   At the very least, Plaintiffs must be given leave to amend.

10      C.      Plaintiffs Have Standing Under The Stored Communications Act

11      The United States contends Plaintiffs lack standing because (1) Mr. Gallagher was

12   not harmed and (2) Donor No. 1 filed the administrative claim anonymously.  Neither

13   contention has merit.

14      Mr. Gallagher has alleged that he was harmed within the meaning of the Stored

15   Communications Act because he alleges that he "used WePay's service to send thank you

16   notes to each donor."  FAC ¶ 66.  Obviously, the WePay Subpoena's request for all

17   information related to the crowd-funding campaign (FAC ¶¶ 3, 32) would have

18   encompassed these messages.  These allegations are taken as gospel at this stage.  *Shapiro*,

19   2017 WL 2902799, at *3.

20      The United States' suggestion that Mr. Gallagher has not alleged "that he was party

21   to communications captured by the subpoena" (Mot. at 20:13-14) is unavailing.  The

22   United States cannot rely on the version of the WePay Response it attached to the Request

23   for Judicial Notice to contradict the well-pleaded allegations in the FAC (*see* Section III,

24   *supra*), particularly where Mr. Gallagher alleges that WePay maintained additional

25   information not included in the version of the response filed at Dkt. 33-2.  FAC ¶ 53.

26      The United States also complains that Donor No. 1 filed an anonymous

27   administrative claim, which allegedly prevented "the agency" from beginning "an

28   investigation."  Mot. at 20:25.  According to the United States, Donor No. 1's anonymous

-10-

claim prevented the agency from investigating whether Donor No. 1's donation occurred prior to the WePay Subpoena and the extent of the harm caused by the WePay Subpoena, meaning the agency could not determine whether to settle Donor No. 1's claim.  Mot. at 24:22-25:17.  These complaints are disingenuous at best.

As the United States acknowledges, Donor No. 1's claim form clearly identified Donor No. 1's counsel.  Dkt. 34-1 at 4-5.  The United States was aware, therefore, that Donor No. 1 was a represented party, meaning the United States was ethically prohibited from contacting Donor No. 1 directly.  The claim form facilitated this by providing Donor No. 1's counsel's contact information.  *Id*.  The United States, however, never utilized that contact information in an effort to resolve the claim.  FAC ¶ 13.  The suggestion, therefore, that the United States was prohibited from investigating or resolving Donor No. 1's claim because it was submitted anonymously is specious at best.

Moreover, Donor No. 1 is entitled to sue anonymously.  FAC ¶ 14 (quoting *Does I – XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1068 (9th Cir. 2000) for the proposition that litigants may proceed anonymously where the "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity.")  Indeed, the right to remain anonymous "is historic, fundamental, and all too often necessary."  *Rosen v. Port of Portland*, 641 F.2d 1243, 1251 (9th Cir. 1981).  This right, however, would be eviscerated if Donor No. 1 were identified before reaching the courthouse steps.  The United States cannot establish that it was prejudiced by Donor No. 1's identity, particularly where if failed to so much as pick up the phone to request any of the information it purportedly lacked from Donor No. 1's counsel.

### D.   The FAC States A Claim For Violation Of The California Constitutional Right To Privacy

A plaintiff bringing a claim for relief for violation of the California constitutional right to privacy must allege:  "(1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a

serious invasion of privacy."  *Hill v. Nat'l Collegiate Athletic Ass'n.*, 7 Cal. 4th 1, 39-40 (1994).  The FAC satisfies all three requirements.

        1.    *The Right to Remain Anonymous Is a Legally Protected Privacy Interest*

       The California Constitution protects Donor No. 1's right to speak anonymously. *Rancho Publications v. Superior Court*, 68 Cal. App. 4th 1538, 1540-41 (1999) ("[t]he right to speak anonymously draws its strength from … the right of privacy in article I, section 1 of the California Constitution.")  Donor No. 1's anonymous donation in support of the legal defense of a jailed political dissident was an act of protected speech.  *Benin v. Center for Study of Popular Culture*, 2007 WL 1795693, at *3 (N.D. Cal. Jun. 20, 2007) ("[s]upport of litigation is a form of expression and association protected by the First Amendment."  (Citing *NAACP v. Button*, 371 U.S. 415, 428-29 (1963)); *Eilers v. Palmer*, 575 F.Supp. 1259, 1261 (D.Minn. 1984) ("compelled disclosure of the names of those individuals or groups supporting the plaintiff's lawsuit would create a genuine risk of interference with protected interests.")  Thus, Donor No. 1 had a legally protected privacy interest in remaining anonymous while donating to the crowd-funding campaign.

       The United States' suggestion to the contrary is unsupported and internally inconsistent.  Mot. at 33:8-34:9.  The United States contends that Donor No. 1 had no interest in making an anonymous donation because his identity "was collected for reasons related to Brown's prosecution, and the Government limited the dissemination of that information by filing it with the court under seal."  *Id.* at 34:1-3.  This is illogical, however, because neither the manner in which information is collected nor the manner in which that information is used after it has been collected can affect the existence of a protected privacy interest *before* the information has been collected and used.

       Leaving that aside, the suggestion that Donor No. 1's identity, the amount of Donor No. 1's donation, Donor No. 1's financial information, and any records obtained from a background check on Donor No. 1 had anything to do with the prosecution of Mr. Brown is specious at best.  Indeed, even after four motions to dismiss, Defendants have failed to

articulate a single use for Donor No. 1's identity in the prosecution of Mr. Brown.  Mr. Brown was charged with internet threats, identity theft, and retaliation against a federal officer.  FAC ¶ 23.  The WePay Subpoena, however, was issued under Fed. R. Crim. P. 17. Accordingly, it could not "provide a means of discovery."  *United States v. Nixon*, 418 U.S. 683, 698 (1974); *United States v. Reed,* 726 F.2d 570, 577 (9th Cir.1984) (subpoenas under Rule 17 are "not intended as a discovery device, or to allow a blind fishing expedition seeking unknown evidence." (Internal citation and quotations removed).) Subpoenas issued under Fed. R. Crim. P. 17 simply provide "a time and place before trial for the inspection of subpoenaed materials."  *Nixon, 418 U.S.* at 698-99.  Further, the information so produced must be relevant and admissible "with respect to the offenses charged in the indictment."  *Id*. at 700.  Therefore, the United States' suggestion that the WePay Subpoena is anything other than an illegal work-around Defendants used to unlawfully surveil the donors to the crowd-funding campaign is untenable.

The United States citation to *Hill* (Mot. at 34:3-5) is inapposite for several reasons. First, the language quoted comes from the "competing interests" section which, as noted below, is an affirmative defense that is unavailable to the United States at this stage in the litigation.  Second, and more importantly, Donor No. 1's harms differ from those at issue in *Hill* because Donor No. 1 did not voluntarily disclose any information to Defendants. Donor No. 1 disclosed information to WePay, which information Defendants unlawfully obtained via the WePay Subpoena.[2]  The plaintiffs in *Hill*, on the other hand, disclosed

---

[2] The United States offers no authority in support of its ridiculous suggestion that Donor No. 1 waived his constitutional right to privacy via WePay's privacy policy.  Moreover, in addition to the fact that whether Donor No. 1 accepted the WePay privacy policy goes well beyond the allegations of the FAC (and is not subject to judicial notice), the United States suggests WePay's privacy policy was presented in a browse-wrap form.  *See Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1177 (9th Cir. 2014) ("where, as here, there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.")  Even if this were a motion for summary

their information to the NCAA but then failed to allege that the NCAA mishandled the information.  That is an entirely different scenario than what occurred here.

Nor does the fact that the fruits of the WePay Subpoena were filed under seal "minimize the privacy intrusion."  Mot. at 34:6 (citing *Pioneer Electronics (USA), Inc. v. Superior Court*, 40 Cal. 4th 360, 371 (2007)).  The WePay Subpoena unmasked Donor No. 1 to the *very agents of the government he sought to criticize with his donation*.  FAC ¶ 51.  That is a fundamentally different, and greater, privacy invasion than the minimal one that occurred in *Pioneer*.  There, the court considered whether and under what circumstances to allow putative class representatives to access the contact information of putative class members.  Critically, the court authorized access to the sought-after contact information *only after the unnamed putative class members were given an opportunity to opt out*.  *Id*. at 373 (noting that "the order [authorizing disclosure of contact information] imposed important limitations, requiring written notice of the proposed disclosure to all complaining Pioneer customers, giving them the opportunity to object to the release of their own personal identifying information.")  Donor No. 1, on the other hand, was given no opportunity to opt out of the WePay Subpoena.  The first element is satisfied.

### 2.   *Donor No. 1 Had a Reasonable Expectation of Privacy*

"A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms."  *Hill*, 7 Cal. 4th at 37.  Here, numerous courts have recognized the fundamental importance of the right to remain anonymous while engaging in protected, expressive activity.  *E.g. McIntryre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (the "decision to remain anonymous … is an aspect of the freedom of speech protected by the First Amendment"); *Talley v. State of California*, 362 U.S. 60, 65 (1960) ("identification [of anonymous speakers] and fear of reprisal might deter perfectly peaceful discussions of public matters of importance"); *Rosen v. Port of Portland*, 641 F.2d 1243, 1251 (9th Cir. 1981) (the right to remain

---

judgment, the United States has presented no information that would allow the Court to make that determination.

SMRH:483728688.1

anonymous while "expressing political, religious, social, or economic views … is historic, fundamental, and all too often necessary"); *Doe v. 2theMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) ("[a]nonymous speech is a great tradition that is woven into the fabric of this nation's history.")  Donor No. 1 reasonably relied on these long-cherished and "widely accepted community norms." *Hill*, 7 Cal. 4th at 37; FAC ¶ 2 (Donor No. 1 assumed his donation "would remain anonymous").  Moreover, Donor No. 1's expectation of privacy was heightened because there was no advance notice of the impending intrusion and Donor No. 1 was not offered a chance to consent to it.  *See Hill*, 7 Cal. 4th at 36-37.  Donor No. 1 should not have been subjected to the dragnet that was the WePay Subpoena simply because he exercised his right to make an anonymous donation to a political cause.  Donor No. 1's expectation of privacy was reasonable.

### 3.  *Defendants Seriously Invaded Donor No. 1's Privacy*

"Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right."  *Hill*, 7 Cal. 4th at 37.  Because this is a context specific inquiry, the Court should consider whether a reviewing court would have authorized production of the information sought by the WePay Subpoena in response to a motion to quash the WePay Subpoena on California constitutional privacy grounds.  The Court should find that this element is satisfied because no court would have authorized the unmasking of Donor No. 1 if Donor No. 1 was notified of the WePay Subpoena and moved to quash it under the California constitutional right to privacy.

Subpoenas are not allowed to expose the identity of anonymous speakers where, as here, the intrusion caused by the loss of anonymity "cannot be justified in the context of the underlying lawsuit."  *Rancho Publications*, 68 Cal. App. 4th at 1541.  This is because "[a]nonymity, once lost, cannot be regained."  *Id*.  Therefore, the qualified immunity "grounded in the free speech and privacy provisions of the United States and California Constitutions," limits what courts can compel in discovery.  *Id.* at 1547-48.  Accordingly,

"[n]umerous decisions" have blocked discovery "that impinges upon free speech or privacy concerns of …innocent third parties." *Id*. at 1548 (collecting cases).

In determining whether to compel production of private information, courts weigh the need for disclosure against the interest in confidentiality, "giving great weight to fundamental privacy rights." *Id*. at 1549.  After applying that balancing test, the court in *Rancho Publications* refused to order production of the identities of the anonymous speakers.  *Id*. at 1550.  In *Rancho Publications*, a local hospital sought to unmask the anonymous publishers of advertisements criticizing the hospitals allocation of funds.  *Id*. The publishers also "criticized the hospital's misuse of the discovery process for the defamation lawsuits [related to the allocation of funding criticism] to muzzle dissent." *Id*. The court found that these tactics presented a classic example of why "the speakers may have chosen anonymity to avoid being swept into litigation purely out of spite for speaking out on a hotly contested issue.  The impact of the proposed discovery upon protected constitutional rights is severe." *Id*. at 1550-51.

Here, the impact of the WePay Subpoena was also severe because, as noted above, it unmasked Donor No. 1 to the government agents Donor No. 1 criticized by donating. Donor No. 1 donated anonymously "to avoid being swept into litigation purely out of spite," but, in Defendants' attempt to "muzzle dissent," Donor No. 1 was dragged into the prosecution of Mr. Brown anyway through the unlawful WePay Subpoena.  *Id*.  Thus, the "highly attenuated relationship" of the information sought by the WePay Subpoena to the prosecution of Mr. Brown did "not warrant shutting off political discourse on an important public issue by speakers who [were] understandably subpoena-shy." *Id*. at 1551.  The WePay Subpoena seriously invaded Donor No. 1's right to privacy.

### 4.   *The United States Cannot Assert an Affirmative Defense in a Motion to Dismiss*

As court in *Hill* recognized, a defendant can prevail on a theory that the privacy invasion should be nullified by the defendant's legitimate interest only "by pleading and proving, *as an affirmative defense*, that the invasion of privacy is justified because it

substantively furthers one or more countervailing interests." *Hill*, 7 Cal. 4th at 40 (emphasis added). The United States' attempt to invoke this defense in a motion to dismiss (*see* Mot. at 35:11-36:1), therefore, is procedurally improper.

In addition to the procedural problem, the asserted "countervailing interest" in ensuring Mr. Brown was not "wrongly receiving court-appointed counsel" has nothing to do with Donor No. 1's identity or the amount of Donor No. 1's donation. It was Mr. Brown, and not the donors to the crowd-funding campaign, who was allegedly "wrongly receiving court-appointed counsel." Indeed, Ms. Heath does not mention a single donor, nor the amount of a single donation, in the motion to direct funds be paid. Dkt. 33-5. There is simply no basis to suggest that a "[c]omplete transaction history, including invoices and sending account numbers and receiving account numbers; [or] [a]ll records and information obtained from any verification checks on purchasers," not to mention "any and all records and information" related to the crowd-funding campaign (Dkt. 33-1 at 5) were in any way related to the prosecution of Mr. Brown.

Finally, Ms. Heath was aware of the purpose of the crowd-funding campaign. In the motion to direct funds be paid, she quotes from the WePay donation page, but, interestingly, she omits a critical passage. *Compare* Dkt. 33-5 at 6:

> Each individual's generosity and support goes directly to Barrett so that someday he will be able to resume his important work. What information you choose to provide will be kept confidential.

*With* Dkt. 29-3 (archived version of WePay donation page):

> Each individual's generosity and support goes directly to Barrett so that someday he will be able to resume his important work. *All donations will be exclusively used to hire private criminal defense counsel.* What information you choose to provide will be kept confidential.

(Emphasis added.) Defendants did not attach "Attachment C" to their Request for Judicial Notice. Donor No. 1 believes, however, that it will demonstrate that Ms. Heath intentionally removed the italicized section. Ms. Heath also knew or should have known that funds were being used for their intended purpose because Mr. Brown's private attorney's appeared in the case one month before the court denied the motion to direct

funds be paid.  Dkt. 33-4 at 7.  Thus, even if the United States could assert the countervailing interest affirmative defense at this stage, the defense would not succeed.

5.   *The United States is Subject to Suit for Violation of Donor No. 1's California Constitutional Right to Privacy*

The United States contends that "[t]he waiver of sovereign immunity in section 702 of the APA is limited to suits seeking judicial review of federal agency action under 28 U.S.C. § 1331" (Mot. at 22:3-5 (citing *Gallo Cattle Co. v. U.S. Dep't. of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998)), but the APA's waiver of sovereign immunity is not as narrow as the United States would have the Court believe.

The APA provides that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States."  5 U.S.C. § 702.  The Ninth Circuit recently recognized that this provision "waives sovereign immunity for" suits like this one that "seek equitable relief against the federal government."  *Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090, 1096 (9th Cir. 2016).

Further, neither § 702 nor *McKelvey* suggest that the APA's waiver is limited to questions of federal law.  *Compare* Mot. at 22:5-7.  To the contrary, the APA can be used to hold the federal government accountable for violations of California constitutional requirements.  *Citizens Legal Enforcement and Restoration v. Connor*, 762 F. Supp. 2d 1214, 1232 (S.D. Cal. 2011) (finding that Cal. Const. Art. X, § 2 imposed "a mandatory duty" on the federal Bureau of Reclamation not to waste or unreasonably use water).  Accordingly, the United States is subject to suit through the APA for violation of Donor No. 1's right to privacy under the California Constitution.[3]

---

[3] Donor No. 1 no longer seeks money damages for Defendants' violation of his right to privacy, rendering the United States' suggestion that he was nevertheless required to comply with the Federal Tort Claims Act (Mot. at 22:17-28:1) irrelevant.  Also irrelevant is the United States' assertion that 18 U.S.C. § 2712 bars Donor No. 1's right to privacy claim.  Mot. at 28:2-30:19.  As the United States admits, § 2712 only applies to civil

V.     CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny the Motion.  If the Court grants the Motion in any respect, Plaintiffs request leave to amend.

Dated:  August 10, 2017

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
CHARLES S. DONOVAN
GUYLYN CUMMINS
ERIC J. DiIULIO
Attorneys for Plaintiffs

---

actions "against the United States to recover money damages."  Mot. at 28:6-8 (quoting 18 U.S.C. § 2712(a)).  Again, Donor No. 1 no longer seeks money damages for Defendants' violation of his right to privacy. FAC at *Prayer*.  Donor No. 1 seeks only declaratory relief (*id*.), which the United States concedes is available.  Mot. at 31:5-32:9.