SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
CHARLES S. DONOVAN, Cal. Bar No. 103667
GUYLYN R. CUMMINS, Cal Bar No. 122445
ERIC J. DiIULIO, Cal. Bar No. 301439
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:        cdonovan@sheppardmullin.com
              gcummins@sheppardmullin.com
              ediiulio@sheppardmullin.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kevin Gallagher, on behalf of himself; and Donor No. 1, individually and on behalf of all anonymous donors to Free Barrett Brown,<br><br>   Plaintiffs,<br><br>  v.<br><br>United States; Candina Heath, in her official capacity; Robert Smith, in his official capacity; Does 1-10,<br><br>   Defendants. | Case No. 3:17-cv-00586-MEJ<br><br>**SECOND AMENDED CLASS-ACTION COMPLAINT FOR VIOLATION OF RIGHT TO SPEAK AND ASSOCIATE ANONYMOUSLY UNDER THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE STORED COMMUNICATIONS ACT**<br><br>**DEMAND FOR JURY TRIAL** |

Kevin Gallagher, on behalf of himself, and Donor No. 1, on behalf of himself and on behalf of all others who are similarly situated, allege:

**INTRODUCTION**

1. This is a case about government agents abusing the trust vested in them by wielding their authority to settle personal scores. Defendants' conduct violated the First Amendment of the United States Constitution and the Stored Communications Act (18 U.S.C. § 2701 *et seq.*).

2. The First Amendment protects anonymity where, as here, identification and fear of reprisal would deter Constitutionally-protected conduct. In short, Mr. Gallagher established a crowd-funding campaign to support the defense of a jailed journalist because he believed that criminal charges were levied because of the anti-government views the journalist espoused, rather than the conduct he engaged in. Donor No. 1 agreed and wished to help provide the journalist with private defense counsel. To that end, Donor No. 1 made a donation to the crowd-funding campaign under the assumption that his donation would remain anonymous. Hundreds of like-minded individuals from all over in the country did the same. These anonymous donations were protected by the First Amendment.

3. The government agents responsible for the arrest and prosecution of the journalist violated the First Amendment by seeking the identities of the donors to the crowd-funding campaign, as well as the amounts of each donation. This violation began when Assistant United States Attorney Candina Heath sent a subpoena (Dkt. 26-1, the "WePay Subpoena") to WePay, Inc. ("WePay"), the host of the crowd-funded legal defense fund, directing WePay to send "any and all information" pertaining to the legal defense fund to Special Agent Robert Smith of the Federal Bureau of Investigation ("FBI"). The subpoena claimed that the information it requested would be used at the trial of the jailed journalist. However, the identities of, and the amounts donated by, the journalist's supporters are completely irrelevant to the charges levied against the journalist. On information and belief, the WePay Subpoena was part of a larger scheme by

Defendants to unlawfully surveil the donors in violation of the First Amendment.  As the Ninth Circuit has recognized, "[t]he right of those expressing political, religious, social, or economic views to maintain their anonymity is historic, fundamental, and all too often necessary.  The advocacy of unpopular causes may lead to reprisals – not only by government but by society in general.  While many who express their views may be willing to accept these consequences, others not so brave or so free to do so will be discouraged from engaging in public advocacy." *Rosen v. Port of Portland*, 641 F.2d 1243, 1251 (9th Cir. 1981).  Defendants' surveillance scheme violated this right.

4.    The WePay Subpoena also violated the Stored Communications Act because it sought the "contents" of "electronic communications" in "electronic storage" without a search warrant or prior notice to Mr. Gallagher, Donor No. 1, or any other affected donor.

### JURISDICTION & VENUE

5.    This Court has original subject matter jurisdiction over the claims for relief for violation of the First Amendment and Stored Communications Act under 28 U.S.C. § 1331.  Donor No. 1 made a donation in this judicial district, and Donor No. 1 also lives in this judicial district.  On information and belief, many other donors live in, and made donations from, California as well.

6.    Donor No. 1 brings his official capacity claim against Ms. Heath and Agent Smith under the Administrative Procedure Act.  The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202.

7.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States who acted within their official capacities while taking the actions subject to complaint, Donor No. 1 resides in this district, and no real property is involved in this action.  Venue is also appropriate under 28 U.S.C. § 1391(b)(2) because the WePay Subpoena was sent to Palo Alto, California and Donor No. 1 made at least one donation within this district.

-2-

Case No. 3:17-cv-00586-MEJ
SECOND AMENDED COMPLAINT

8. **Intradistrict Assignment**: Donor No. 1's donation was made in Alameda County.  Accordingly, assignment to the San Francisco or Oakland Division would be appropriate.

## PARTIES

9. Kevin Gallagher is a resident of San Francisco, California.

10. Donor No. 1 is a resident of this judicial district who made an anonymous donation from within this judicial district to support the legal defense of a jailed journalist.

11. Pursuant to 18 U.S.C. § 2712 and 28 U.S.C. § 2675, Mr. Gallagher and Donor No. 1 filed administrative claims with the Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI") on or about March 30, 2016.  See Exhibits A and B.  The government made no effort to resolve these claims.

12. Donor No. 1 satisfies the requirements to sue anonymously.  In the Ninth Circuit, plaintiffs may proceed anonymously where the "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." *Does I – XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1068 (9th Cir. 2000). This test is satisfied where, as here, "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity."  *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992).  Donor No. 1 made an anonymous donation to the Free Barrett Brown legal defense fund.  This suit seeks to protect Donor No. 1's right to remain anonymous while doing so, a right long recognized as a necessary corollary of the First Amendment.  *See NAACP v. Alabama*, 357 U.S. 449 (1958).  Revealing the name of Donor No. 1 would cause the very injury this suit seeks to redress.

13. At all times relevant to this action, defendant Candina Heath was a citizen of Texas who worked for the Department of Justice ("DOJ") where she was an Assistant United States Attorney in the Northern District of Texas.  Donor No. 1 sues Ms. Heath in her official capacity.

14.     At all times relevant to this action, defendant Robert Smith was a citizen of Texas, where he was a Special Agent in the Dallas office of the FBI.  Donor No. 1 sues Agent Smith in his official capacity.

15.     Plaintiffs sue the United States pursuant to 18 U.S.C. § 2712.

16.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued as Does 1-10 and therefore sue such Defendants under fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of Does 1-10 when their true names and capacities have been ascertained.  On information and belief, Does 1-10 are legally responsible in some manner for the events described in this Complaint, and for the damages suffered by Plaintiffs and the donors to Free Barrett Brown.  At all relevant times, Does 1-10 acted as agents, servants, and/or employees of the named defendants.

## FACTUAL BACKGROUND

17.     Since Edward Snowden revealed the National Security Agency's secret surveillance program, Americans have become more aware of the United States government's indiscriminate monitoring of American citizens.  This newfound knowledge has been made possible by journalists and activists seeking to hold the government accountable for its surveillance activities.  One of these individuals is Barrett Brown, a journalist who has reported extensively on the links between the United States government and private intelligence contractors.  The investigative activities of Mr. Brown, and others like him, have been noticed by the government.

18.     Various groups of computer hackers have also attacked these private intelligence firms and exposed their data and internal communications.  The hack of one such firm, Strategic Forecasting, Inc. ("Stratfor"), was coordinated by an FBI informant and carried out by Jeremy Hammond.[1]  The informant, Hector Xavier Monsegur, provided Mr. Hammond with information about the vulnerability of Stratfor's systems.  At that time,

---

[1] http://www.dailydot.com/politics/hammond-sabu-fbi-stratfor-hack/

SMRH:484498630.1
SECOND AMENDED COMPLAINT

the FBI had Mr. Monsegur under comprehensive surveillance. On information and belief, the FBI was aware that Mr. Monsegur was coordinating the Stratfor hack before it occurred, and could have prevented it. The FBI elected not to prevent the hack because it wanted to use Stratfor as bait to go after Mr. Hammond, one of the most prominent members of Anonymous, a loose affiliation of computer hackers and activists. The Stratfor hack produced millions of emails which contained, among other things, thousands of credit card numbers and authentication features. One former FBI agent characterized the government's conduct as follows: "I am concerned in this case that the FBI seemed more interested in inflating the potential charges rather than mitigating the potential harm to innocents."[2]

19.    In December of 2011, Mr. Brown transferred a link to a file containing credit card information from one public chatroom to another. The FBI, anxious to conceal its involvement in the hack, cracked down hard.

20.    In early 2012, agents of the FBI, led by Agent Smith, executed a search warrant at the home of Mr. Brown's mother.

21.    This greatly upset Mr. Brown, who posted three videos on www.youtube.com and several statements on www.twitter.com that threatened Agent Smith. Shortly thereafter, Mr. Brown was indicted for those statements and for copying and pasting the link to the hacked documents between chat rooms. Among other things, Mr. Brown was charged with internet threats, retaliation against a federal law enforcement officer, and aggravated identity theft. At one point, he faced over 100 years in prison. For purposes of comparison, Jeremy Hammond, the hacker who unlawfully accessed and initially posted the documents, faced a maximum penalty of ten years in prison for his crimes.

22.    News of Mr. Brown's arrest spread amongst free speech and free press advocates. As the charges piled up, mainstream media picked up on the story. The

---

[2] *Id.*

SMRH:484498630.1                                    SECOND AMENDED COMPLAINT

details of Mr. Brown's arrest, and the charges he faced, eventually reached Kevin Gallagher, a computer systems administrator.

23.     After learning of the severity of the sentence Mr. Brown faced, Mr. Gallagher started a crowd-funding campaign called Free Barrett Brown to raise funds to provide a private defense for Mr. Brown.[3]  Mr. Gallagher used WePay to set up the campaign.  At that time, WePay's website advertised that it provided "everything you need to engage donors and accept donations."[4]  Once a webpage was created, WePay helped users like Mr. Gallagher accept donations and publicize their causes through social media and Google searches.  It also provided a record keeping service that helped users thank donors.  In exchange for these services, WePay took a percentage of each donation received.

24.     Individuals, including Donor No. 1, donated over $40,000.00 to Free Barrett Brown through the page Mr. Gallagher created, www.wepay.com/donations/free-barrett-brown.  The donors provided WePay with their bank account or credit card information to complete these transactions.  In the course of making their donations, WePay also offered donors the option to include a message.  Many donors took advantage of this to send Mr. Brown messages of support such as:

- "the American people vitally need to know what their employees are doing, not the other way around!"

- "prosecutorial bludgeoning must end";

---

[3] Mr. Gallagher initially used Mr. Brown's and his mother's information to set up the campaign, but he added himself as a user during the initial set-up process and later removed Mr. Brown's mother entirely.  Indeed, before the motion Ms. Heath filed to seize the funds in the WePay account and order them paid to the public defender (styled a Motion To Direct Funds Be Paid (Dkt. 26-4) and hereafter referred to as the "Motion to Seize") was heard, Mr. Brown's mother was removed from the account and the only bank account linked to the crowd-funding campaign was the bank account of Free Barrett Brown Ltd., a non-profit Mr. Gallagher set up to accept the donations.

[4] WePay has since discontinued this aspect of its service.

SMRH:484498630.1                                          SECOND AMENDED COMPLAINT

- "I stand with Barrett Brown and against oppressive U.S. government prosecution of journalists"; and

- "I think it is imperative that everyone who cares about free speech, a free internet, or is horrified by prosecutorial overreach, donate to Barrett Brown's legal defense."

25.    The donations themselves were also protected political speech.  The donation page stated "[e]ach dollar raised is your vote in this important campaign for free speech and transparency on the internet – and around the world."  Exhibit C.

26.    The First Amendment protects the donors' right to send these donations and messages, and it protects their right to remain anonymous while doing so. Cognizant of the particularly sensitive nature of the cause for which he was soliciting donations, Mr. Gallagher took every effort to maintain the anonymity of the donors to Free Barrett Brown.  He informed the donors via the donation page that "[w]hat information you choose to provide will be kept strictly confidential."

27.    Shortly after it began, the Free Barrett Brown campaign attracted the attention of the DOJ and the FBI, and Defendants began their illegal monitoring program. Once Agent Smith learned that Mr. Brown was receiving support via the Free Barrett Brown crowd-funding campaign, he enlisted the help of Ms. Heath and the two of them began efforts to identify and surveil Mr. Brown's financial supporters.

28.    On information and belief, Defendants conspired to draft and serve the WePay Subpoena, which was part of a larger scheme to unlawfully identify, target, and surveil supporters of Mr. Brown.  As part of the illegal surveillance scheme, Defendants also sent a subpoena to the web-hosting company CloudFlare, Inc.  One media outlet characterized the use of Mr. Brown's trial to seek information from such sources as "a remarkable fishing expedition."[5]  On information and belief, the unlawful surveillance

_____

[5] http://www.crikey.com.au/2013/04/05/reveal-the-truth-about-cybersecurity-face-the-wrath-of-the-us/

SMRH:484498630.1
SECOND AMENDED COMPLAINT

scheme also sought information from, among other sources, social media websites, payment processing companies, financial institutions, and other crowd-funding websites in order to identify and obtain as much information as possible about Mr. Brown's supporters.  Donor No. 1 believes this scheme was initiated to harass the donors, to retaliate against them for the donors' exercise of protected conduct (making anonymous donations in support of Mr. Brown's legal defense), and to chill the future expression of such protected conduct.

29.     Mr. Gallagher first suspected that Defendants might have been illegally monitoring protected communications between himself and the donors when he obtained email correspondence that suggested that Ms. Heath had obtained sensitive, non-public information regarding the creation of, and donations made to, the Free Barrett Brown crowd-funding campaign.

30.     Mr. Gallagher investigated whether any sensitive, non-public information was improperly disclosed.  During the investigation, counsel for Mr. Gallagher received a letter from counsel for WePay confirming that WePay received the WePay Subpoena and produced documents in response.  Then, counsel for WePay produced the WePay Subpoena, which sought "any and all information" regarding the campaign, including sensitive personal and financial information of the donors and the complete transaction history.  In other words, the WePay Subpoena requested the identities of, and the amounts of donations made by, the donors to Free Barrett Brown in direct violation of the donors' First Amendment right to make these donations anonymously.  The WePay Subpoena's broad scope also encompassed the messages the donors sent to Mr. Brown.

31.     The WePay Subpoena indicated that the information it requested would be used in the trial of Barrett Brown.  Oddly enough, however, instead of asking WePay to send its response directly to Ms. Heath, the prosecutor, or to lodge its response with the court, the WePay Subpoena compelled WePay to produce information directly to Agent Smith of the FBI.  This renders the WePay Subpoena improper under Federal Rule of Criminal Procedure 17(c).  It also demonstrates that Defendants' claimed purpose of

using the information produced in response to the WePay Subpoena at Barrett Brown's trial was purely pretextual.  The true goal of the WePay Subpoena, rather, was to facilitate the unlawful surveillance of the anonymous donors to the crowd-funding campaign.

32.    Upon discovering that the WePay Subpoena was unlawful, Mr. Gallagher informed the donors.  Donor No. 1 was alarmed to learn that his government illegally surveilled his donation.  Donor No. 1 does not publicize his financial activities and always ensures that any donations he makes are kept private.

33.    Plaintiffs believe Defendants' surveillance scheme continues today and that the information gained from the WePay Subpoena, and others like it such as the Cloudflare subpoena, is currently being used to monitor Mr. Brown's supporters.  Though the prosecution of Mr. Brown has ended, Mr. Brown was assessed nearly $1 million worth of fines and restitution.  On July 8, 2015, the Courage Foundation initiated a fundraising campaign to help Mr. Brown pay these charges.  To date, nearly 300 donations have been made in support of Mr. Brown's cause through the website hosted by the Courage Foundation.  As with the Free Barrett Brown campaign, many of the donations have been anonymous.

34.    Further, the DOJ, through the United States Attorney's Office for the Northern District of Texas and the Bureau of Prisons, continues to harass Mr. Brown.  For instance, even though the payment plan set forth in the judgment against Mr. Brown required him to pay 10% of his monthly income and Mr. Brown never missed a payment, the United States Attorney's office subpoenaed the media organization Mr. Brown wrote for while incarcerated and requested financial records and all communications between the organization and Mr. Brown.  This was despite the fact that the United States Attorney's Office for the Northern District of Texas already had access to comprehensive financial information on Mr. Brown, including his bank account and tax returns, so there was no legitimate reason for the DOJ to request this information.  Further, even though he was released almost immediately, the Bureau of Prisons arrested Mr. Brown for a purported failure to obtain permission to conduct media interviews.  In light of these actions,

-9-

SMRH:484498630.1                                    SECOND AMENDED COMPLAINT

Plaintiffs believe the government is not finished with Mr. Brown or his supporters and that the surveillance of the donors is ongoing.

## CLASS ACTION ALLEGATIONS

### (as to Donor No. 1's claims)

35. For the First Amendment claim, Donor No. 1 proposes to certify a class of all United States citizens who made anonymous donations in support of Mr. Brown.

36. For the Stored Communications Act claim, Donor No. 1 proposes to certify a class of all United States citizens who made donations to the Free Barrett Brown campaign.

37. Excluded from the classes are: Ms. Heath and Agent Smith, and each of their agents and legal representatives. Also excluded are the judge and staff to whom this case is assigned, and the judge's immediate family.

38. These classes satisfy the requirements of Fed. R. Civ. Proc. 23(a):

a. **Numerosity**: hundreds of individuals from around the United States donated over $50,000.00 to support Mr. Brown, mostly in small amounts. On information and belief, all of these individuals are affected by the improper surveillance activities alleged. The number of donors alone would make joinder impractical, but a class action is a particularly appropriate vehicle given that the donations were anonymous. It would make little sense to require donors to come forward individually, and publicly, to assert their right to remain anonymous.

b. **Commonality**: virtually all questions of law and fact are common to the class. The most important are whether the WePay Subpoena, *and any other improper requests for information*, violate the donors' constitutional and statutory rights. Other common questions include:

(1) whether the WePay Subpoena sought information irrelevant to the prosecution of Mr. Brown;

SMRH:484498630.1

(2)    whether the WePay Subpoena was procedurally defective under Fed. R. Crim. Proc. 17(c);

(3)    whether Ms. Heath and Agent Smith needed a search warrant to obtain the information requested by the WePay Subpoena;

(4)    whether Ms. Heath and Agent Smith were required to notify the donors prior to sending the WePay Subpoena and whether they did so; and

(5)    whether Ms. Heath and Agent Smith conspired to unlawfully surveil Mr. Brown's supporters for improper reasons.

c.    **Typicality**: Donor No. 1 suffered invasions of his First Amendment right to speak and associate anonymously and his rights under the Stored Communications Act.  These are the same injuries suffered by the rest of the classes.  He seeks redress of the same conduct under the same legal theories.

d.    **Adequacy**: Donor No. 1 is an adequate class representative because he has the same interests as the rest of the donors and is prepared to serve as their fiduciary.  Donor No. 1's counsel have ample First Amendment and class action litigation experience.

39.    This action may be certified as a class action under both Fed. R. Civ. Proc. 23(b)(2) & (3).

40.    **Fed. R. Civ. Proc. 23(b)(2):** Defendants' conduct applies to all donors in the class.  Further, Donor No. 1 seeks declaratory and injunctive relief that would apply with equal force class-wide.

41.    **Fed. R. Civ. Proc. 23(b)(3):** Common questions predominate and a class action is a superior method of resolution.

a.    **Predominance of Common Questions**: nearly all questions are common, including:

SMRH:484498630.1

Case No. 3:17-cv-00586-MEJ

SECOND AMENDED COMPLAINT

(1)      whether Ms. Heath and Agent Smith engaged in a conspiracy to unlawfully surveil the donors who financially supported Mr. Brown;

(2)      whether such conspiracy violated the donors' constitutional and statutory rights;

(3)      whether Ms. Heath and Agent Smith needed a search warrant to obtain the information requested by the WePay Subpoena;

(4)      whether Ms. Heath and Agent Smith were required to notify the donors prior to sending the WePay Subpoena and whether they did so;

(5)      whether the WePay Subpoena requested information that was relevant to the crimes Mr. Brown was accused of; and

(6)      whether there is a valid justification for the WePay Subpoena beyond a desire to unlawfully surveil Mr. Brown's supporters.

b.      **Superiority of Class Action**: a class action is particularly appropriate in this circumstance because aggrieved donors may be hesitant to vindicate their rights on an individual basis for fear of government retaliation.  The class action vehicle allows individual rights to be vindicated while the individuals remain anonymous, as they were when they made their donations, and as they should have remained.  Further, proceeding as a class action will save time and judicial resources.

**FIRST CLAIM FOR RELIEF – VIOLATION OF THE FIRST AMENDMENT RIGHT TO SPEAK AND ASSOCIATE ANONYMOUSLY**

**(Donor No. 1 and the Class Against Defendants Heath and Smith)**

42.      Donor No. 1 incorporates each of the allegations set forth above into this claim for relief.

43.      Defendants acted under color of law by serving the WePay Subpoena. The WePay Subpoena's bald assertion that the information it requested would be used at

-12-

Mr. Brown's trial, without any indication or evidence of a connection to the crimes Mr. Brown was charged with, demonstrates the complete lack of relevance of the information requested. The WePay Subpoena's true purpose was to gather information regarding the donors. When WePay produced documents in response (the "WePay Response"), the violation was complete. Because Defendants had no cause to suspect wrongdoing by the donors, and thus could not otherwise obtain information about the donors legally, they used the trial of Mr. Brown, and the WePay Subpoena, as an illegal work-around.

44.     The donations were acts of political expression, showing the donors' frustrations with what they perceived to be government bullying and prosecutorial overreach. Donations made in support of litigation are protected by the First Amendment. The donors violated no law by sending money to support Mr. Brown's legal defense, and instead were exercising their constitutionally protected rights. Thus, Defendants' surveillance of the donors was unlawful.

45.     In response to the initial complaint in this action, Defendants contended there was "an obvious alternative explanation for the WePay Subpoena:  to determine if Brown, who was previously appointed a public defender, could afford his own attorney." Dkt. 25 at 2:3-5. As Defendants were well aware, however, Mr. Brown had not been (and never was) charged with withholding funds from the public defender. Dkt. 26-3. Indeed, the very purpose of the campaign was to hire private counsel *to relieve the public defender's office of the obligation to continue representing Mr. Brown*. Defendants' fishing expedition to discover unknown evidence of an uncharged crime using the WePay Subpoena was wholly inappropriate because a subpoena duces tecum is not a discovery device and cannot be used to discover unknown evidence.

46.     Even if the trial subpoena employed by Defendants could be used to discover evidence, however, it is patently obvious that it was completely unnecessary in this instance. Defendants claim the WePay Subpoena was justified because it revealed Mr. Brown was "the beneficiary of approximately $20,000 raised for the specific purpose of paying for an attorney[.]" Dkt. 25 at 19:8-9. This information, however, was readily

-13-

available to them without the WePay Subpoena because WePay, like most crowd-funding sites, tracked the total amount raised and made that amount publicly visible on the donation page.  In fact, as shown on Exhibit C (an Internet Archive Wayback Machine capture of the Free Barrett Brown donation page), as of April 24, 2013 the donors had contributed $19,478.00 to the crowd-funding campaign.  If Defendants were aware of the donation page, surely they were aware of the donation tracker and knew how much money had been raised in support of Mr. Brown's legal defense before they served the WePay Subpoena.  Defendants therefore did not "learn" anything from the WePay Subpoena that they did not already know.

47.    Nor could Defendants credibly contend that Mr. Brown intended to dupe his donors by withholding the funds for himself while retaining the services of the public defender.  First, by the time the Motion to Seize was heard, Mr. Brown no longer had access to the donated funds.  Donations received through the WePay page were sent directly to Free Barrett Brown, Ltd., the non-profit Mr. Gallagher established to manage the donations.  Second, Mr. Brown's private counsel appeared in the case one month *before* the order denying Ms. Heath's Motion to Seize was issued.  Dkt. 26-3 at 7.  So, even though Ms. Heath was well-aware that the funds were being used for their stated purpose, she did not withdraw the Motion to Seize.  In other words, the result of the Motion to Seize, which is the only asserted justification for the WePay Subpoena, was to order the funds to be paid where Mr. Gallagher and the donors intended them to go and where Defendants knew they were going.  *See* Exhibit C ("[a]ll donations will be exclusively used to hire private defense counsel.")  Thus, the Motion to Seize was entirely unnecessary.

48.    Further, even if Defendants were concerned that Mr. Brown would abscond with the WePay funds (a concern that would be preposterous in light of the foregoing), still the WePay Subpoena would not pass constitutional scrutiny.  If, as Defendants contend, the purpose of the WePay Subpoena was to determine the amount of money Mr. Brown had access to, surely that information could have been obtained with a

more precise tool than the WePay Subpoena, which was fatally overbroad. Nowhere in the Motion to Seize (*see* Dkt. 26-4) or in their Motion to Dismiss (*see* Dkt. 25) do Defendants justify the requests for "any and all information" pertaining to the WePay account, a "[c]complete transaction history," or "[a]ll records and information obtained from any verification checks on purchasers." That is because the breadth of the WePay Subpoena cannot be justified.

49. Even assuming that Defendants needed to subpoena anything from WePay (which assumption Plaintiffs do not concede), the only information necessary to the Motion to Seize was the amount of the money in the WePay account that was available to Mr. Brown. This information was all provided on the first page of the WePay Response. Dkt. 26-2 at 2. Thus, to the extent there is some minimal justification for seeking discovery from WePay, discovery related to the identities of, and the amounts donated by, the individual donors was completely unjustified and wholly irrelevant to the Motion to Seize.

50. Moreover, Defendants have inaccurately presented the information provided in the WePay Response. The version of the WePay Subpoena attached to Defendants' Request For Judicial notice is preceded by a document bearing the seal of the FBI that indicates the WePay Subpoena was redacted specifically for filing in this action. Dkt. 26-1 at 2-3. The filed version of the WePay Response is also redacted, but it does not indicate that it was specifically redacted to be filed in this action. Dkt. 26-2. The WePay Response, however, **was** redacted specifically to be filed in this action. Indeed, defense counsel confirmed as much in a May 9, 2017 email, stating "[w]e plan to redact both the names of the donors and the last four digits of their credit card/bank accounts" from the WePay Response. Plaintiffs believe, therefore, that the WePay Response did include the identities of, and the amounts donated by, the individual donors. Therefore, the WePay Response unmasked the previously anonymous donors *to the very agents of the government they intended to criticize with their donations.*

-15-

Case No. 3:17-cv-00586-MEJ
SECOND AMENDED COMPLAINT

51.     Alternatively, the WePay Response at Dkt. 26-2 could be a copy of what Defendants filed in the criminal prosecution of Mr. Brown.  If that is the case, and Defendants did not inform Magistrate Judge Stickney that they had obtained the identities of the donors (such as if Ms. Heath filed a redacted version of the WePay Response without informing the court that she (and not WePay) was the one who performed the redactions), Magistrate Judge Stickney's finding (upon which Defendants heavily rely) that the Motion to Seize was filed "in the interests of justice" would be of no effect because he would have been oblivious to the First Amendment violation.

52.     Further, WePay maintained more information about the crowd-funding account than what appears in the version of the WePay Response produced by Defendants at Dkt. 26-2.  For instance, while the version of the WePay Response filed by Defendants suggests WePay only maintained the date of donation, payment method, identity of the donor, and donation/fee amounts, information available to Mr. Gallagher as the account administrator confirms that WePay also maintained the addresses, phone numbers, email addresses, and the text of messages sent by donors.

53.     Finally, it is clear that Defendants served the WePay Subpoena "*because of*[,] not merely in spite of, the [donors' anti-government] message."  Dkt. 25 at 9:12.  Ms. Heath made her desire to suppress constitutionally-protected speech clear during the gag order hearing in the criminal prosecution of Mr. Brown when she argued that Mr. Brown should be gagged because he had written an article that was "critical of the government" in a "tone" that was "problematic."

54.     In light of the foregoing, and because the WePay Subpoena sought information that was irrelevant to the charges brought against Mr. Brown, Donor No. 1 believes the WePay Subpoena was sent to retaliate against the donors' exercise of protected conduct in violation of their First Amendment right to anonymous speech and association, and to deter further protected expression.  The unmasking of the anonymous donors was a cognizable First Amendment injury in and of itself.  Defendants have filed information produced in response to the WePay Subpoena in this action, so it is

indisputable that they still maintain this information.  Based on the continued maintenance of the information, the continuing donations in support of Mr. Brown, and the government's continued harassment of Mr. Brown, Donor No. 1 believes Defendants continue to use the information produced in response to the WePay Subpoena, as well as other information gathered from the illegal monitoring program, to continually and unjustifiably surveil Mr. Brown's financial supporters.

**SECOND CLAIM FOR RELIEF – VIOLATION OF**

**THE STORED COMMUNICATIONS ACT**

**(Kevin Gallagher, Donor No. 1, and the Class Against the United States)**

55.    Plaintiffs incorporate each of the allegations set forth above into this claim for relief.

56.    The Stored Communications Act ("SCA") provides that government entities must obtain a warrant to compel the disclosure of the contents of electronic communications that are less than 180 days old from electronic communication service providers.  18 U.S.C. § 2703(a).

57.    Government entities may require the disclosure of contents of electronic communications that are more than 180 days old from electronic communication service providers with a subpoena only if prior notice is given to the customer or subscriber.  18 U.S.C. § 2703(b).  The same standard applies to a government request for information from a remote computing service.  *Id*.

58.    An "electronic communication service" allows users to "send or receive wire or electronic communications."  18 U.S.C. § 2510(15).

59.    A "remote computing service" provides "computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2).

60.    An "electronic communication" is "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part

-17-

by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce[.]"  18 U.S.C. § 2510(12).

61.    The "contents" of "electronic communications" include "any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

62.    "Electronic storage" under the SCA "means—(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17).

63.    Defendants admit that "[t]he Government did not follow § 2703(a) when it sought records from WePay" because "there was no search warrant, and the subpoena did not come with notice to subscribers."  Dkt. 28 at 7:19-20.  Thus, if "WePay was (i) an 'electronic communications service' (ii) holding the 'contents of electronic communications' (iii) in 'electronic storage'" (*Id.* at 8:1-2), Defendants violated the SCA.

64.    During the relevant time period, WePay ran a crowd-funding service that allowed users to create webpages geared towards soliciting donations in support of certain causes.  WePay helped users publicize the webpages they created, donors could make contributions, and WePay would take a commission for processing each transaction.

65.    The webpage Mr. Gallagher created using WePay's service allowed him to communicate with potential and actual donors to Mr. Brown's legal defense fund and process their donations by electronic means.  Specifically, WePay's "[i]ntegrated processing allow[ed] [Mr. Gallagher] to track and thank donors."  *See* Exhibit D.  Mr. Gallagher used WePay's service to send thank you notes to each donor.  Mr. Gallagher and the donors could not have consummated these transactions or sent these communications without the help of WePay's service.

66.    Therefore, WePay provided either an "electronic communication service" or a "remote computing service."

-18-

Case No. 3:17-cv-00586-MEJ

SMRH:484498630.1

SECOND AMENDED COMPLAINT

67.     The anonymous donors used WePay's service to donate money and send messages of support to Mr. Brown, such as "Hang in there Mr. Brown, there are people rooting for you" and "Thank you for your integrity and fight for freedom."  By donating, the donors intended to vote "for free speech and transparency on the internet." Exhibit C.  They were also expressing their displeasure with the government's heavy-handed approach to the prosecution of Mr. Brown.

68.     Thus, the donations, and the messages of support, encompass the contents of electronic communications as defined by the SCA.   These contents were knowingly and intentionally accessed by Defendants via the WePay Subpoena.  As set out in the first claim for relief, Defendants had no legitimate basis for seeking the identities of the donors and the amounts of their donations.  Accordingly, the violation was willful within the meaning of the SCA.  Further, revealing the identities of the donors to the very agents of the government the donors sought to criticize with their donations caused the donors actual damages in the form of a cognizable First Amendment injury – the veil of their anonymity was unlawfully pierced.

69.     In light of the failure to obtain a search warrant or notify the donors, Defendants were not authorized to access the information stored on WePay's servers.

70.     On information and belief, WePay used its servers to store this information for a back-up purpose, as it allowed Mr. Gallagher to manually review the donations after they occurred.  Accordingly, it was in "electronic storage" within the meaning of the SCA.

71.     Each Defendant acted willfully, intentionally, and knowingly in violating Plaintiffs' rights under the SCA in disclosing and/or accessing each communication.

72.     Finally, the WePay Subpoena seeks information beyond the SCA's narrow and carefully circumscribed exception for requesting records without a search warrant or notice to the affected users.

SMRH:484498630.1

## PRAYER FOR RELIEF

Donor No. 1 prays for judgment against Defendants:

## FIRST CAUSE OF ACTION:

A.    Declaring that the conduct alleged above violated the First Amendment rights of Donor No. 1 and the class;

B.    Directing the FBI, DOJ, and other agencies or entities that received donors' private, sensitive information to destroy such information;

C.    Enjoining Defendants from engaging in similar unlawful surveillance in the future, including any surveillance of the Courage Foundation campaign;

D.    Awarding Donor No. 1 the costs, including reasonable attorney's fees, associated with bringing this action; and

E.    Any other relief the Court deems proper.

## SECOND CAUSE OF ACTION:

A.    Declaring that the conduct alleged above violates the SCA;

B.    Awarding Kevin Gallagher, Donor No. 1, and the class money damages, including statutory damages, and reasonable litigation costs under 18 U.S.C. § 2712(a);

C.    Directing the FBI and the DOJ to initiate a proceeding to determine whether discipline is warranted against Agent Smith and Ms. Heath; and

D.    Any other relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Donor No. 1 demands a jury trial on the first cause of action.

SMRH:484498630.1

Case No. 3:17-cv-00586-MEJ

SECOND AMENDED COMPLAINT

Dated:  October 24, 2017       Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
CHARLES S. DONOVAN
GUYLYN CUMMINS
ERIC J. DiIULIO
Attorneys for Plaintiffs

SMRH:484498630.1

Case No. 3:17-cv-00586-MEJ
SECOND AMENDED COMPLAINT